# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND    )
SOUTHWEST AREAS PENSION FUND,   )
and HOWARD McDOUGALL, Trustee,    )
                                  )
            Plaintiffs,           )     No. 10 C 358
                                  )     Marvin E. Aspen
            v.                  )
                                  )
NAGY READY MIX, INC., et al.        )
                                  )
            Defendants.       )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us are cross-motions for summary judgment in this withdrawal liability action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs, a multiemployer pension fund and its trustee (collectively "the Fund"), seek judgment against Defendants Nagy Ready Mix, Inc., Nagy Trucking, Inc., Nagy Concrete Company (collectively, "the Nagy Entities") and Charles F. Nagy[1] for approximately $3.6 million, which represents the withdrawal liability that Nagy Ready Mix incurred in June 2007.[2] The Nagy Entities concede that they are collectively liable to the Fund for any withdrawal liability assessment and thus, we enter summary judgment against the Nagy Entities. (*See* Defs.' Resp., Dkt. No. 45, at 2.)

The parties dispute, however, whether Nagy can be held personally liable for the

---

[1] We previously dismissed Defendants Rose M. Nagy and Five Little Truckers, Inc. per the parties' stipulation. (*See* Dkt. Nos. 33–34.)

[2] The Nagy Entities have challenged the amount of the withdrawal liability assessed by the Fund. That dispute remains pending in arbitration and is of no consequence here.

withdrawal liability, based on certain of his business activities. The Fund contends that Nagy's conduct in leasing property to Nagy Ready Mix constitutes a "trade or business" under ERISA § 1301(b)(1), subjecting him to liability. The Fund argues that Nagy's work for Wells Venture Corporation ("WVC"), an unrelated entity, also qualifies as the operation of a trade or business within the statute's meaning. Having considered these arguments and the evidence before us, we deny Defendants' motion, but grant Plaintiffs' motion.

## BACKGROUND FACTS[3]

The essential facts are undisputed. When the withdrawal occurred in June 2007, Nagy owned, directly or indirectly, at least 80% of either the total combined voting power or the total value of all outstanding stock of the Nagy Entities. Nagy also served as the president, treasurer, and a member of the board of directors for each of the Nagy Entities. Nagy acknowledges that he controlled the Nagy Entities.

### A.      Lease of the Hixson Property

Nagy Ready Mix—the entity that incurred the withdrawal liability—was a ready mix concrete company, located at 48000 Hixson, Utica, Michigan ("the Hixson Property"). Nagy Trucking also operated out of the Hixson Property. Nagy Ready Mix bought the Hixson Property in 1972, after Nagy selected the parcel and negotiated the terms of the purchase. In 1986, Nagy Ready Mix conveyed the Hixson Property to Nagy, who retained ownership either directly or through his personal trust ("the Trust") for estate planning purposes. At the time of the original purchase, the Hixson Property held a ready mix plant and garage. Thereafter, while

---

[3] Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits.

under Nagy's control, the old ready mix plant was destroyed and replaced with a new facility. A reclaimer system, a second ready mix plant, and an office building were also constructed on the Hixson Property.

Prior to 2005, Nagy, through the Trust, leased the Hixson Property back to Nagy Ready Mix.[4] Nagy set the terms of the lease, which was a triple net lease, and signed the agreement on behalf of both landlord and tenant. Pursuant to the triple net lease, Nagy Ready Mix was responsible for all utility, insurance and tax bills, as well as maintenance and repair of the Hixson Property. Nagy testified that he spent one hour per year on matters concerning the lease of the Hixson Property to Nagy Ready Mix. Nagy Ready Mix paid monthly rent to Nagy, who deposited the checks into a personal joint bank account shared with his wife. For each of the tax years 2005 through 2008, Nagy reported rental income of $108,000 from his lease of the Hixson Property. Nagy also deducted depreciation expenses from the rental income during these tax years.

**B.    Nagy's Work for WVC**

Nagy held a minority ownership interest in WVC and several other entities, which collectively owned, developed and operated a golf course and restaurant at the course. Nagy also has served as president and a member of the board of directors for WVC and the related entities. From the early-1990s through 2005, Nagy oversaw daily operations of the golf course

---

[4] The lease between the Trust and Nagy Ready Mix indicates that the rental arrangement began January 1, 1998. (*See* Pls.' Add'l Facts, Dkt. No. 49, Ex. 7.) Neither Nagy, nor Steven Simpson (the general manager of Nagy Ready Mix) were aware of any prior lease agreements. (Nagy Dep. at 65–66; Simpson Dep. at 17–18.)

as its administrative officer.[5]  He also performed bookkeeping and management services for WVC, such as bank reconciliation, meeting with attorneys, and processing paperwork for house lot sales.

In 2005, a decision was made to sell the golf course, and Nagy's responsibilities increased.  At that point, the board of directors began compensating Nagy for his duties, which expanded to include negotiation of the sale of the course.  All golf course employees were terminated when the course was sold, but Nagy remained and continued to provide management and other services.  Although Nagy considered himself to be a WVC employee "in a sense," he was not paid as an employee; he received a 1099 Form for his services, rather than a W-2.  (Pls.' Resp. Defs.' SOF ¶ 35 & Nagy Dep. at 35.)  Nagy elected to receive a 1099, like an independent contractor, because he did not want to bother with regular payroll reporting for a single worker—himself.  The purchaser of the golf course eventually fell behind in its payments, and Nagy took on the task of pursuing default remedies, including retaining legal counsel.  WVC and the related entities repossessed the golf course in January 2010.

During tax years 2005 through 2008, Nagy reported his WVC income on Schedule C of his federal tax returns.  Schedule C concerns "Profit or Loss from Business (Sole Proprietorship)."  In these returns, Nagy described his principal business as "accounting services," though he testified that he used this phrase as a "catch-all" for his daily management

---

[5] Nagy has testified that he is WVC's president.  (*See* Nagy 1/4/11 Aff. ¶¶ 1, 4.)  In his reply, he provided documentation that identifies him as WVC's Chief Executive Officer and treasurer for 2005 and 2006; the president appears to have been another person at that time. (Pls.' Reply at 6 & Ex. B.)  Nagy has also stated that he worked occasionally as the Chief Operating Officer ("COO") from 2005 through 2008.  (Pls.' Add'l Facts, Dkt. No. 49, Ex. B, Defs.' Ans. to First Set Interr. ¶¶ 18, 22, 24.)  For consistency's sake, we will refer to Nagy as the COO, although his particular title is not material to our analysis.

services.  (Nagy Dep. at 34–35.)  Though an accountant by education, Nagy has not performed any accounting services except for: (1) family, without remuneration; or (2) a corporate entity in which he held an ownership interest.  Nagy stated on the Schedules C that his business address was WVC's address, until he began working out of his home after the 2005 sale of the golf course.  Although the returns indicate that Nagy deducted "office expense[s]" in 2007 and 2008, he did not treat these expenses as relating to "business use" of his home.  (*See* Nagy Dep., Exs. 2–5 at Schedule C ¶¶ 18, 30.)  Nagy stated each year that he "materially participate[d]" in his accounting services business.  WVC paid Nagy $150 per hour for his work, and he reported more than $214,000 in income from WVC for these four tax years.

The parties dispute why Nagy worked for WVC and the related golf course entities.  According to his deposition and affidavit, however, Nagy worked for WVC for various reasons, including the above-noted compensation and to protect his substantial investment.  (*See* Nagy 1/4/11 Aff. ¶ 16 (indicating that "one of the primary reasons" was to protect his interests in the entities); Nagy Dep. at 34–35, 49–52 (describing his services, hourly rate and payment).)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal

quotations omitted). Once the moving party meets this burden of production, the nonmoving

party "must go beyond the pleadings" and identify portions of the record demonstrating that a

material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). In deciding whether summary

judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all

reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1990

("MPAAA"), imposes withdrawal liability on employers who cease to contribute to a multi-

employer pension fund. *See* 29 U.S.C. §§ 1001–1371, 1381–1461; *see also Central States v.

Neiman*, 285 F.3d 587, 594 (7th Cir. 2002); *Central States v. Fulkerson*, 238 F.3d 891, 894 (7th

Cir. 2001); *Central States v. SCOFBP, LLC*, 738 F. Supp. 2d 840, 845 (N.D. Ill. 2010). This

liability represents "the employer's proportionate share of the unfunded vested benefits owed to

its employees." *SCOFBP, LLC*, 738 F. Supp. 2d at 845 (internal quotation omitted); *Neiman*,

285 F.3d at 594; *Central States v. White*, 258 F.3d 636, 640 (7th Cir. 2001). "Congress

established withdrawal liability . . . to ensure that when an employer withdraws from a pension

plan, the financial burden of its employees' vested pension benefits would not be borne by the

other employers in the plan." *Central States v. Personnel, Inc.*, 974 F.2d 789, 791 (7th Cir.

1992); *SCOFBP, LLC*, 738 F. Supp. 2d at 846 (explaining that ERISA is designed "to protect

employees who have been promised retirement benefits from employers who seek to avoid their

responsibilities").

To further this purpose, ERISA withdrawal liability extends to all "trades or business

(whether or not incorporated) which are under common control." 29 U.S.C. § 1301(b)(1); *White*,

258 F.3d at 640.  Thus, each trade or business under common control with the withdrawing employer becomes jointly and severally liable for the liability.  *Neiman*, 285 F.3d at 594; *White*, 258 F.3d at 640; *Fulkerson*, 238 F.3d at 894.  "[T]o impose withdrawal liability on an organization other than the one obligated to the fund, two conditions must be satisfied: (1) the organization [or individual] must be under common control with the obligated corporation; and (2) it must be a trade or business."  *Fulkerson*, 238 F.3d at 894; *Neiman*, 285 F.3d at 594; *White*, 258 F.3d at 640; *SCOFBP, LLC*, 738 F. Supp. 2d at 845.  Here, the parties do not dispute that Nagy controlled the Nagy Entities.  The question before us is whether any of Nagy's other, unincorporated activities constitute engaging in a trade or business such that he can be personally responsible for the withdrawal liability.

In conducting this analysis, we rely on the test established in *Commissioner v. Groetzinger*, 480 U.S. 23, 35, 107 S. Ct. 980, 987 (1987), for determining whether an activity is a trade or business.  *White*, 258 F.3d at 642 (internal quotation omitted).  Under *Groetzinger*, "we consider whether the person engaged in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity."  *White*, 258 F.3d at 642; *McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 577 (7th Cir. 2007); *Neiman*, 285 F.3d at 594; *Fulkerson*, 238 F.3d at 895.  With these standards in mind, we turn to Nagy's activities.

## A.      Lease of the Hixson Property

With respect to the leasing activities, Nagy apparently does not contest that he leased the Hixson Property to Nagy Ready Mix for the primary purpose of income or profit.  Rather, the parties debate whether Nagy's involvement was sufficiently regular and continuous to warrant liability.

## 1. Liability Based on Possession of the Lease

The Seventh Circuit has repeatedly stated that no economic nexus between the alleged trade or business and the withdrawing employer is required to establish liability. *White*, 258 F.3d at 641; *Fulkerson*, 238 F.3d at 895 n.1; *Personnel, Inc.*, 974 F.2d at 793; *Central States v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992). That being said, the existence of such a relationship is not irrelevant. The Seventh Circuit, for example, has also noted that leasing property to a withdrawing employer bears significance when determining liability. *Central States v. Ditello*, 974 F.2d 887, 890 (7th Cir. 1992); *Personnel, Inc.*, 974 F.2d at 793–94; *see also SCOFPB, LLC*, 738 F. Supp. 2d at 849. The Fund contends that our analysis should focus primarily on this consideration; according to the Fund, Nagy must be held liable in this case because he leased the Hixson Property directly to Nagy Ready Mix, the withdrawing employer. (Pls.' Mem. at 13–15; Pls.' Reply at 9–11.) The Fund stresses that finding Nagy liable would thus further the purpose of the MPAAA, which "is to prevent dissipation of assets required to secure vested pension benefits." *Central States v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992); *Ditello*, 974 F.2d at 890 (emphasizing that "[l]easing property to a withdrawing employer is an economic relationship that could be used to . . . fractionalize assets and avoid withdrawal liability"); *see Personnel, Inc.*, 974 F.2d at 794. The Fund relies on an earlier line of cases supporting this argument. (Pls.' Mem. at 13–15; Pls.' Reply at 9–11.) *Ditello*, 974 F.2d at 890; *see also Personnel, Inc.*, 974 F.2d at 794–96; *Central States v. Koder*, 969 F.2d 451, 453–55 (7th Cir. 1992); *Slotky*, 956 F.2d at 1374. The Seventh Circuit has more recently encouraged courts, however, to undertake a more fact-specific analysis pursuant to *Groetzinger*. *See Neiman*, 285 F.3d at 593–94 (quoting *Groetzinger*'s admonition that our determination of "whether an activity is a trade or business

'requires an examination of the facts of each case'"); *see also White*, 258 F.3d at 642–44; *Fulkerson*, 238 F.3d at 894–96. In *Fulkerson*, for example, the Seventh Circuit reaffirmed use of the *Groetzinger* test and added that "one purpose of the *Groetzinger* test is to distinguish trades or business from investments." 238 F.3d at 895. The district court in *Fulkerson* had held the owners of a trucking business liable for the entity's withdrawal liability because the owners also leased a few properties. *Id.* at 892–94. That court concluded that because the Fulkersons held the leases for multiple years, the conduct had been regular and continuous. *Id.* at 894–95. The Seventh Circuit reversed, holding that "mere ownership of a property (as opposed to activities taken with regard to the property) cannot be considered in determining whether conduct is regular or continuous." *Id.* at 895–96. The Seventh Circuit reasoned that "possession of property, be it stocks, commodities, leases, or something else, without more is the hallmark of an investment" and not a trade or business under *Groetzinger.* In reaching its conclusion, the court acknowledged the purpose underlying the MPAAA but remained "mindful that § 1301(b)(1) was not intended to impose automatic personal liability on individuals who own companies that are required to contribute to pension funds." Based on the holding in *Fulkerson*, we decline to adopt the Fund's proposition that liability must be imposed on Nagy solely because he both owned and leased property to a withdrawing employer.

### 2. Liability Based on Lease-Related Activities

Rather, in determining whether Nagy's leasing activities rise to the level of regular and continuous, we consider his personal conduct related to the lease of the Hixson Property. As mentioned above, the proper inquiry involves review of all "activities taken with regard to the property." *Fulkerson*, 238 F.3d at 895; *White*, 258 F.3d at 642–44; *see also Personnel, Inc.*, 974

F.2d at 794–96.  The *Fulkerson* court explained that "[a]ctions of a person, such as negotiating leases, researching properties, maintaining or repairing properties, etc. are business or trade conduct and are thus appropriately considered in determining whether the continuity and regularity prong of *Groetzinger* is satisfied."  238 F.3d at 895.  Because the MPAAA does not impose personal liability on the shareholders of a withdrawing entity, *Fulkerson*, 238 F.3d at 895, we must be careful to focus our analysis on Nagy's conduct as landlord of the Hixson Property—and not as owner and president of the Nagy Entities.

Contrary to the Fund's assertion, we cannot consider Nagy's pre-lease conduct in evaluating his liability.  The Fund contends that we should include in our calculus Nagy's involvement in the demolition of the original ready mix plant, as well as the construction of the new plant, a second plant and an office building—all of which took place in approximately 1990.  (Pls.' Mem. at 12; Pls.' Reply at 9–10; *see* Nagy Dep. at 62–63 (testifying in his October 2010 deposition that these improvements were made "about 20 years ago").)  They also point to Nagy's selection and purchase of the property in the early 1970s as evidence of his regular and continuous activity.  (Pls.' Mem. at 12; Pls.' Reply at 9–10.)  But Nagy undertook these tasks as the owner and founder of the Nagy Entities, not as the landlord of the Hixson Property.  We cannot treat these activities as related to the alleged rental side business, as they occurred well in advance of the 1998 lease.

In addition, we will not impute the conduct of Nagy Ready Mix employees to Nagy in his capacity as landlord.  The Fund suggests that the maintenance, repair and other routine tasks handled by Nagy Ready Mix employees to keep up the Hixson Property should be attributed to Nagy, as the company's owner.  (Pls.' Mem. at 12 n.6; Pls.' Reply at 10.)  The Fund again

misunderstands the scope of our analysis. We cannot conflate Nagy's dual roles, even though those roles of owner and landlord concern a single piece of property and overlapped occasionally. Under the express terms of the lease, Nagy Ready Mix, as tenant, was responsible for insurance, taxes, maintenance and repair. Nagy, as landlord, deliberately transferred these tasks to Nagy Ready Mix. Although we might attribute the employees' conduct to Nagy as owner for certain purposes, it should not bear on his alleged ERISA liability as a landlord. The Fund's citation to *Alvary v. United States* is not persuasive, as the landlord there used an agent to fulfill duties on behalf of the landlord and the rental business. 302 F.2d 790, 796–97 (2d Cir. 1962) (holding that the lessor engaged in a trade or business where his agent in another city collected rents, use the funds to pay taxes, and arranged repairs). Here, Nagy Ready Mix employees maintained the Hixson Property at the direction of Steven Simpson and on behalf of Nagy Ready Mix, not on behalf or at the behest of Nagy himself. (*See* Nagy Dep. at 67–71; Simpson Dep. at 19–22.)

We thus turn to consider whether Nagy's personal activities related to the lease rise to the level of being regular and continuous. The parties do not dispute that Nagy set the terms of the lease and executed it as both landlord and tenant. Nagy accepted significant rental income for the Hixson Property under the lease, beginning in 1998 and totaling $108,000 a year. He deposited the rent checks into a personal joint bank account. Nagy reported this rental income on Schedule E of his tax returns and deducted depreciation expenses. As landlord, Nagy was also consulted about improvements to the Hixson Property. (Nagy Dep. at 70:9–16.) Based on Nagy's testimony, he thus would have discussed the construction of the reclaimer system at the Hixson Property, which occurred sometime in the 2000s. (*Id.* at 62:20–63:2.) Nagy testified

that he spent one hour per year working on issues related to the rental of the Hixson Property. (*Id.* at 71.)

The facts of this case strongly resemble the facts in *Fulkerson*. There, Tom Fulkerson leased a few properties, in addition to owning a trucking company that became the withdrawing employer. 238 F.3d at 893. Fulkerson rented one of the properties, though a triple net lease, to a trucking company owned by his sons. *Id.* Like Nagy, "Tom had few obligations associated with being a traditional landlord" and devoted little time—five hours a year—to such duties. *Id.* Fulkerson simply paid the mortgage, accepted rent checks and reported the income on Schedule E of his tax returns. *Id.* Based on these facts, the Seventh Circuit could not conclude that Fulkerson's conduct was regular and continuous. *Id.* at 896–97 (remanding to district court to consider his activities in detail, beyond his possession of the lease).

Here, we have two additional facts to evaluate: (1) Nagy's limited role in the construction of the reclaimer system; and (2) Nagy's deduction of depreciation expenses. Neither of these facts proves helpful for the Fund, however. As for the reclaimer system, Nagy's limited involvement with a single improvement to the Hixson Property over the course of the lease does not transform this arrangement into a trade or business, particularly in light of his uncontroverted testimony that he spent only one hour per year on lease-related activities. As for the tax deductions, the Seventh Circuit rejected an identical argument raised by the Fund in another case. *White*, 258 F.3d at 644. In *White*, the Fund argued that the Whites engaged in a trade or business because "they obtained actual and substantial tax benefits from renting the property . . . and obtained deductions and depreciation." *Id.* The court found this argument unconvincing, adding that "[t]he same such arguments could be made about any other traditional investment

activity." *Id.*

Our purpose under the *Groetzinger* test "is to distinguish trades or business from investments." *Fulkerson*, 238 F.3d at 895. Not surprisingly, there is a spectrum of activity between these two benchmarks. We hold that Nagy's rental conduct resembles a passive investment, as in *Fulkerson*, far more than a trade or business.

## B.     Managerial Work for WVC

We now turn our focus to whether Nagy's work for WVC constitutes a trade or business within ERISA's meaning. The parties agree that this question is best answered by determining whether Nagy was an independent contractor or a WVC employee. (*See* Defs.' Reply at 5.) In other words, if Nagy was an independent contractor, he was thus operating a separate business under common control with Nagy Ready Mix and is liable for its withdrawal liability. If Nagy was simply a WVC employee, however, his work should not be deemed a trade or business.

The Seventh Circuit has set out five factors that guide our analysis. *See Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549–50 (7th Cir. 2002); *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 963 (7th Cir. 2001); *EEOC v. North Knox School Corporation* 154 F.3d 744, 747 (7th Cir. 1998). This test requires that we consider:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work place, (3) responsibility for the costs of the operation, such as equipment, supplies, fees, licenses, workplace, and maintenance operations, (4) method and form of payment, and (5) length of job commitment and/or expectations.

*North Knox*, 154 F.3d at 747 (quoting *Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996)); *see Mazzei*, 246 F.3d at 963. Our determination of Nagy's status as either an employee or independent contractor is a question of law, although it necessarily "involves an

application of the law to the facts." *North Knox*, 154 F.3d at 747 & n.1 (internal citation omitted).

### 1.     Control and Supervision

When evaluating this first factor, we look to whether "the employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which the result is achieved." *Alexander*, 101 F.3d at 493 (internal citation omitted); *Hojnacki*, 285 F.3d at 550–51. Although we evaluate all five factors, the "employer's right to control is the most important." *North Knox*, 154 F.3d at 747 (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991)).

There is no dispute that Nagy performed significant duties as CEO of WVC during the relevant time period. From the early 1990s through 2005, Nagy oversaw daily operations at the course on a unpaid basis. Beginning in 2005, Nagy took on additional duties in connection with the sale of the golf course. At that point, the board of directors (of which he was a member) decided to compensate Nagy for his responsibilities, which included negotiation of the sale and various management tasks. When the purchaser defaulted, Nagy decided to pursue foreclosure and hired counsel. Nagy continued his management services following WVC's repossession of the golf course in 2010, to the present day.

The parties also do not dispute that no one at WVC supervised Nagy's work on a daily basis. The record does not indicate to what extent, if any, the board of directors might have monitored Nagy's progress. There is simply no evidence showing that anyone directed his work, in any way or at any time during his tenure at WVC.

As the Fund acknowledges,[6] the fact that Nagy was left to his own devices is not particularly telling, given that he was the CEO. His very job was to be the primary decision-maker for WVC for many years, particularly after he became the last man standing due to the sale in 2005. Nonetheless, Nagy's role as CEO does not dictate a conclusion that he was an employee; it is, of course, entirely possible to hire a CEO as an independent contractor. On the whole, Nagy's complete control over both the means and ends of his work favors a determination that he was an independent contractor.

### 2. Kind of Occupation and Skills

"Highly skilled positions, particularly where skills are learned outside of a particular job setting, are generally held by independent contractors rather than employees." *Kerr v. WGN Continental Broadcasting, Co.*, No. 01 C 7196, 2002 WL 1477629, at *5 (N.D. Ill. July 9, 2002); *see also Mazzei*, 246 F.3d at 964; *Yonan v. U.S. Soccer Federation, Inc.*, No. 09 C 4280, 2011 WL 2473385, at *5 (N.D. Ill. June 22, 2011). Substantial job training by an entity, on the other hand, suggests an employer-employee relationship. *See Hojnacki*, 285 F.3d at 550; *Yonan*, 2011 WL 2473385, at *5; *Kerr*, 2002 WL 1477629, at *5. Here, the parties agree that this factor is essentially neutral. (Pls.' Reply at 5–6; Defs.' Reply at 7.) There is no evidence that WVC provided Nagy with any training. Nagy is an accountant by education though not licensed to practice publicly as a CPA. (*See* Pls.' Resp. Defs.' Facts ¶¶ 41–42.) Many of his WVC responsibilities involved rather generic management tasks, such as bookkeeping and processing paperwork for the sale of house lots.

---

[6] The Fund states that because "Nagy was a part-owner of WVC, this factor may not be as important as in other cases." (*See* Pls.' Resp. at 12 (adding that "to the extent it is considered, it is evidence that Nagy" was a contractor).)

We agree with Nagy that some of his functions, such as negotiating the sale of the golf course, are closely related to his role as CEO. (Def's Reply at 7.) Nonetheless, his reliance on confidential WVC information does not make him more or less skilled. Both employees and independent contractors frequently rely on corporate information to accomplish their jobs. All in all, this factor is inconclusive.

### 3.    Responsibility for Costs of Operation

This third factor focuses on whether the worker bears "responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance operations." *North Knox*, 154 F.3d at 749 (quoting *Alexander*, 101 F.3d at 492); *Aberman v. J. Aboucher & Sons, Inc.*, 160 F.3d 1148, 1151 (7th Cir. 1998); *Yonan*, 2011 WL 2473385, at *6; *Kerr*, 2002 WL 1477629, at *5. An employer-employee relationship is more likely to exist where the employer pays for these types of overhead expenses. *North Knox*, 154 F.3d at 749; *Aberman*, 160 F.3d at 1151; *Kerr*, 2002 WL 1477629, at *5.

Although the parties dispute whether WVC or Nagy provided and maintained a workspace, the facts are quite clear. Nagy testified that he worked for WVC at the golf course until it was sold. (Nagy Dep. at 37, 39.) Thereafter, he worked for WVC from his home, which relatedly became the business address for WVC. (*Id.*; *see also* Defs.' Reply at 8 & Ex. B.) Nagy did not, however, choose to work from home in lieu of a WVC location. Other than his home, WVC had no office available to him after the 2005 sale. In addition, although Nagy worked out of his home, he did not claim a deduction for expenses related to "business use of [his] home." (*See* Pls.' Facts, Exs. 2–5 (Schedules C for 2005–08), Line 30 (listing no "[e]xpenses for business use of your home").) *See also* IRS Form 8829, *available at*

http://www.irs.gov/pub/irs-pdf/f8829.pdf.  Based on these facts, we find that Nagy did not maintain a separate workspace, in the practical sense, as might an independent contractor.

The record does not include much detail about Nagy's responsibility for WVC supplies and other expenses during the relevant years.  Nagy deducted a small amount for office expenses related to his work for WVC in 2007 and 2008.  (*See* Pls.' Facts, Exs. 2–5 (Schedules C for 2007–08), Lines 18 & 28.)  He claimed $150 in office expenses in total.  Although we have no information about these costs, it is unlikely that WVC incurred only $150 worth of operating expenses over these two years.  For example, Nagy testified that, by and during 2007, he was meeting with lawyers and deciding how to proceed in light of the purchaser's non-payment. (Nagy Dep. at 51.)  Yet Nagy did not deduct expenses for "legal and professional services," which suggests that he did not pay for them out of pocket and that WVC paid for them.[7]

The Fund argues that Nagy "did not testify that he was reimbursed for operating expenses."  (Pls.' Reply at 6.)  But he also did not testify that he was *not* reimbursed; counsel never asked Nagy about these deductions.  While Nagy's responsibility for WVC expenses remains an open question to some extent, we do not find this issue to be dispositive.  Even if Nagy paid for all of WVC's expenses during this time period, which seems improbable, this factor does not significantly favor either party's position.

### 4.      Method and Form of Payment

The fourth factor, like the first, is hotly disputed.  This factor concerns the method and form of the hired party's compensation, as well as its tax treatment.  *See Mazzei*, 246 F.3d at 964–65; *North Knox*, 154 F.3d at 750; *Alexander*, 101 F.3d at493; *see also Neiman*, 285 F.3d at

---

[7] We acknowledge the possibility that he paid for any legal or other expenses voluntarily.

595 (relying on worker's form and tax treatment of compensation when affirming district court's conclusion that plaintiff engaged in a trade or business under *Groetzinger* test). The Fund emphasizes that Nagy did not receive a set salary through a payroll system. (*See* Pls.' Resp. at 13.) Rather, WVC paid Nagy by the hour, without payroll deductions or fringe benefits.[8] Moreover, WVC did not treat Nagy like an employee by issuing him a W-2 for tax purposes; instead it used a 1099, the "Miscellaneous Income" form appropriate for independent contractors. *See Mazzei*, 246 F.3d at 964–65; *North Knox*, 154 F.3d at 750. Finally, when completing his tax returns, Nagy reported his WVC income on Schedule C, which concerns "Profit or Loss from Business (Sole Proprietorship)." The facts strongly evince independent contractor status. *North Knox*, 154 F.3d at 750; *see also Neiman*, 285 F.3d at 595.

In opposition, Nagy testified that he elected to use a 1099 for reporting his income to the IRS instead of a W-2 because he was the only WVC employee after the sale of the golf course and he "didn't want to deal with all the payroll reporting" for himself. (Nagy Dep. at 40; *see* Nagy 1/4/11 Aff. ¶ 10 (explaining that he used 1099 "to avoid the need to retain a separate regular payroll for a single employee performing extensive but separate services not subject o any regular schedule or payment period").) This explanation somewhat mitigates the otherwise obvious and overwhelming evidence that Nagy was paid as an independent contractor. This is not a case, for example, where a business issues 1099s to workers of a particular type. *See, e.g.*, *Mazzei*, 246 F.3d at 964–65 (discussing 1099s issued to truck owner-drivers); *North Knox*, 154 F.3d at 750 (discussing 1099s issued to bus drivers). Here, Nagy was the only remaining

---

[8] WVC's payment of Nagy on an hourly basis does not support either party's position. It is not uncommon for both employees and independent contractors to be paid by the hour.

employee, worked for an entity he partly owned, and apparently decided on behalf of WVC how to handle his own compensation. We find some merit in Nagy's intuitive argument.

Nonetheless, we agree with the Fund that Nagy's use of a 1099 and a Schedule C when filing his returns decidedly tips the balance to their advantage. He elected this tax treatment and received its benefits. Considering all of the present circumstances, this factor supports a conclusion that Nagy was an independent contractor.

### 5. Job Commitment or Expectations

When evaluating this fifth factor, we bear in mind that "an employment relationship is more likely to be found where the parties have an expectation that their relationship will continue." *Kerr*, 2002 WL 1477629, at *5 (citing *Hojnacki*, 285 F.3d at 550). "Long term, exclusive relationships are consistent with employer-employee status where as non-exclusive arrangements indicate independent contractor status." *Yonan*, 2011 WL 2473385, at *7 (internal quotation omitted); *see Alexander*, 101 F.3d at 493 (concluding that doctor was an independent contractor in part because he was "free to associate himself with other hospitals if he wished to do so"). In addition to the length of the relationship, relevant inquiries include whether the hired party may stop working at any time, reject assignments, or work for other entities. *Alexander*, 101 F.3d at 493; *Yonan*, 2011 WL 2473385, at *7; *Kerr*, 2002 WL 1477629, at *5.

Here, there is no dispute that Nagy was permitted to work for other entities without any apparent limitation while serving as CEO. Nagy testified that he was president of Nagy Ready Mix while performing services for WVC. (Nagy Dep. at 39–40.) He was also a sales agent for another entity during 2008, though apparently he was unsuccessful in that endeavor. (*Id.* at 55–56; *see* Pls.' Add'l Facts, Dkt. No. 49, Ex. 5.)

The parties also do not dispute that WVC began compensating Nagy only when he picked up responsibility for "necessary negotiation and sale of the assets, post-sale management of the assets and obligations resulting therefrom" in addition to his preexisting management and bookkeeping duties. (Nagy 1/4/11 Aff. ¶ 7.) Nagy had not been paid for those preexisting "sporadic management services" for at least nine years prior to the decision to sell the golf course. (*Id.* ¶¶ 2, 4–5, 7.) These facts strongly suggest that Nagy was retained—at least initially—for the specific task of negotiating the sale and then transitioning the golf course to the purchaser. Had the sale gone through without a hitch, it seems likely that Nagy would no longer work for WVC. As it happens, however, Nagy continues to work for WVC in light of its repossession of the golf course.[9] (*See* Defs.' Reply at 10.)

Considering all of these circumstances, we conclude that this factor tips in favor of the Fund's position. Nagy was not retained until he took on the additional project of facilitating the sale, an arrangement that presumably would not have led the parties to expect any long-term relationship at the time. This arrangement, though now indefinite, has not been exclusive. This continuity cannot overcome the other relevant facts, and this factor plainly favors a finding that Nagy was an independent contractor.

**6.      Liability Determination**

In reviewing and balancing the above factors, we must conclude that Nagy worked for WVC as an independent contractor. The first, fourth and fifth factors weigh heavily in favor of this holding. The second and third factors are neutral and cannot tip the balance back in Nagy's favor. We hold that Nagy's activity, as an independent contractor, was regular and continuous,

---

[9] The record does not indicate Nagy's current duties at WVC or whether he is paid.

thereby satisfying the *Groetzinger* test.  *See White*, 258 F.3d at 642 (explaining *Groetzinger* test, which states that a trade or business arises only where a person engages in activity for income and with continuity and regularity).

In his briefs, Nagy claims that his primary purpose in working for WVC was not for income or profit.  (*See* Defs.' Mem. at 12; Defs.' Resp. at 5, 7.)  Citing to *Higgins v. Commissioner of Internal Revenue*, 312 U.S. 212 (1941), he argues that he undertook duties at WVC "primarily for the purpose of maintaining his personal investment interests."  (Defs.' Mem. at 12.)  As such, he was not engaged in a trade or business because he was merely "acting on his own behalf to manage his own personal investments."[10]  (*Id.*)

Nagy's reliance on *Higgins* is misplaced.  The petitioner in *Higgins* sought review of the tax court's determination that he was not carrying on a business, where he devoted substantial time and resources to managing his stocks, bonds and real estate holdings.  312 U.S. 212, 213, 61 S. Ct. 475, 476 (1941) (explaining that petitioner sought to deduct the expenses related to maintenance of his holdings).  The Supreme Court affirmed, noting that "[n]o matter how large the estate or how continuous or extended the work required may be," the facts showed that Higgins was simply monitoring his own investments—not running a business from which he could deduct expenses.  *Id.* at 218, 61 S. Ct. at 478.  The facts in *Higgins*, however, are easily distinguishable from those present here.  Higgins, for example, "did not participate directly or indirectly in the management of the corporations in which he held stocks or bonds."  *Id.* at 214,

_____

[10] Nagy's affidavit does not unequivocally support this contention.  Although Nagy states therein that "*[o]ne of* the primary reasons" he agreed to work for WVC was to "protect [his] substantial investment," he does not claim that this was his sole or true motivation.  (Nagy 1/4/11 Aff. ¶ 16 (emphasis added).)

61 S. Ct. at 476. With the help of his salaried staff, Higgins "merely kept records and collected interest and dividends from his securities, through managerial attention." *Id.* at 218, 61 S. Ct. at 478. Without question, Nagy had considerably more personal involvement with his investment in WVC than Higgins had with his holdings. Indeed, unlike Higgins, Nagy directly managed his investment on a daily basis for years. *Higgins* is thus inapposite.

In sum, we find that Nagy's activity as an independent contractor for WVC satisfies the *Groetzinger* test and constitutes a trade or business. We therefore hold him personally liable for Nagy Ready Mix's outstanding withdrawal liability.

## CONCLUSION

For the reasons set forth above, we grant the Fund's motion for summary judgment in its entirety, and deny Defendants' motion. We hold the Nagy Entities (Nagy Ready Mix, Inc., Nagy Trucking, Inc., and Nagy Concrete Company) and Charles F. Nagy liable for the withdrawal liability incurred by Nagy Ready Mix. The Fund shall submit an appropriate judgment order at soon as practicable. It is so ordered.

Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: July 22, 2011